· 600 S.E.2d 204

Harvey MAUPIN, Jr., Petitioner Below, Appellee,

v.

George SIDIROPOLIS, Commission Chairman, Dr. Bryan Mitchell, Commission Member, Andrew Payne, III, Commission Member, and the West Virginia Racing Commission, a Statutory Body, Respondents Below, Appellants.

No. 31642.

Supreme Court of Appeals of West Virginia.

Submitted: April 28, 2004.

Filed: June 16, 2004.

McGraw, J., dissented and filed opinion.

---

Darrell V. McGraw, Jr., Esq., Attorney General, Stephen Stockton, Esq., Senior Assistant Attorney General, Charleston, for the Appellants.

Walton S. Shepherd, III, Esq., Sissonville, for Amicus Curiae, Roger White.

H. Wyatt Hanna, III, Esq., Hanna & Page, South Charleston, for the Appellee.

PER CURIAM.

The appellants herein and respondents below, the West Virginia Racing Commission and its constituent members [hereinafter collectively referred to as "the Racing Commission"], appeal from an order entered March 26, 2003, by the Circuit Court of Kanawha County. By the terms of that order, the circuit court found that the appellee herein and petitioner below, Harvey Maupin, Jr. [hereinafter referred to as "Maupin"], was entitled to collect monies from the West Virginia Greyhound Breeding Development Fund [hereinafter referred to as "the Fund"], W. Va.Code § 19–23–10(d) (1995) (Repl.Vol. 2001) and W. Va.C.S.R. § 178–2–51 (2000), based upon his ownership of two greyhounds. On appeal to this Court, the Racing Commission contends that the circuit court erred by allowing Maupin, who allegedly co-owns the

dogs in question with a non-West Virginia resident, to participate in the Fund. Upon a review of the parties' arguments, the record submitted for appellate consideration, and the pertinent authorities, we affirm the circuit court's ruling.

## I.

### FACTUAL AND PROCEDURAL HISTORY

The facts underlying this appeal began in 2000 when the appellee herein, Harvey Maupin, Jr.,[1] purchased a greyhound dam[2] from Daryl Brumage.[3] On August 29, 2000, Maupin purchased the greyhound dam "Holy Miloni" from Brumage, and on February 27, 2001, he purchased another greyhound dam, "RC's In Sync," also from Brumage. At the time of the purchases, Maupin paid consideration for the dogs, but allegedly gave Brumage a right to repurchase the dogs in the event Maupin should choose to sell them. Upon the conclusion of the transactions, the dogs' registration with the National Greyhound Association was changed to reflect Maupin as the dogs' owner.[4] However, according to Maupin, in order to facilitate Brumage's reacquisition of the dogs, should he choose to do so at some future point in time, the registration listed the dogs' owners as "Daryl Brumage or Harvey O. Maupin, Jr.".[5]

On March 12, 2001, the West Virginia Racing Commission sent Maupin a letter informing him that because he and Brumage were listed as the dogs' co-owners, and because Brumage was not a West Virginia resident,

the dogs would not be eligible to receive payments from the West Virginia Greyhound Breeding Development Fund. Maupin responded and asked that the Commission reconsider its decision insofar as Brumage was not a co-owner, but merely retained the option to repurchase the dogs. The Commission denied Maupin's request by letter dated August 12, 2001, finding that Brumage's option to repurchase constituted an equitable interest sufficient to cloak him with ownership status.

Upon Maupin's request, the Commission held a hearing in this matter on April 25, 2002. Maupin testified that he was the sole owner of the dogs, and submitted an affidavit from Brumage denying that he had any ownership interest in them, but that he did retain an option to repurchase the dogs. By order entered August 7, 2002, the Commission again found that Brumage's right to repurchase the dogs constituted a property interest, and, because Brumage was not a West Virginia resident, the dogs were not eligible for payments from the West Virginia Greyhound Breeding Development Fund.

Maupin then appealed the Commission's decision to the Circuit Court of Kanawha County pursuant to W. Va.Code § 19–23–17 (1969) (Repl.Vol.2001).[6] By order entered March 26, 2003, the circuit court determined that

[t]he West Virginia Racing Commission Greyhound Rules of Racing define "owner" as: "the person in whose name the greyhound is registered at the meeting in ac-

---

1. Mr. Maupin is a resident of West Virginia.

2. A "dam" is "a female parent[,] . . . esp. of a domestic animal." Webster's Ninth New Collegiate Dictionary 323 (1983).

3. Mr. Brumage resides in Colorado.

4. *See infra* note 14.

5. On August 21, 2001, the registration documents for "Holy Miloni" were changed to reflect Maupin as her sole owner. However, based upon the documents presently before the Court, "RC's In Sync's" registration has not been so changed solely to Maupin's name.

6. W. Va.Code § 19–23–17 (1969) (Repl.Vol.2001) directs that

[a]ny person adversely affected by a decision of the racing commission rendered after a hearing held in accordance with the provisions of section sixteen [§ 19–23–16] of this article shall be entitled to judicial review thereof. All of the pertinent provisions of section four [§ 29A–5–4], article five, chapter twenty-nine-a of this code shall apply to and govern such judicial review with like effect as if the provisions of said section four were set forth in this section . . . .

The judgment of the circuit court shall be final unless reversed, vacated or modified on appeal to the supreme court of appeals in accordance with the provisions of section one [§ 29A–6–1], article six, chapter twenty-nine-a of this code.

*See infra* note 7.

cordance with the rules and may be the sole owner, part owner or lessee." 178 C.S.R. 2 § 2.[68]. A "meeting" is defined as "the total specified periods and dates each year during which an association is authorized by the Racing Commission to conduct racing and/or pari-mutuel wagering." 178 C.S.R. 2 § 2.58.

The court then concluded that "[t]he definition of 'owner' clearly does not include individuals with an option to repurchase, right of first refusal, or other vague property interests. Therefore, the Commission's determination that Brumage was an owner of the dogs was a clear error of judgment." Upon these findings, the circuit court declared Maupin to be the sole owner of the dogs and to be entitled to payments from the West Virginia Greyhound Breeding Development Fund. From this adverse ruling, the West Virginia Racing Commission and its constituent members appeal to this Court.

## II.

### STANDARD OF REVIEW

▮ The sole issue presented by this appeal concerns Maupin's entitlement to receive monies from the West Virginia Greyhound Breeding Development Fund. As such, we are called upon to interpret the statutory and regulatory requirements for participation in the Fund. Because this inquiry requires us to review the circuit court's disposition of the underlying administrative order and to determine a question of law, our review of the circuit court's decision is *de novo.* In this regard, we previously have held that

> [o]n appeal of an administrative order from a circuit court, this Court is bound by the statutory standards contained in W. Va.Code § 29A–5–4(a) [7] and reviews questions of law presented *de novo;* findings of

7. W. Va.Code § 29A–5–4(a) (1998) (Repl.Vol. 2002) provides that "[a]ny party adversely affected by a final order or decision in a contested case is entitled to judicial review thereof under this chapter, but nothing in this chapter shall be deemed to prevent other means of review, redress or relief provided by law." *See supra* note 6.

8. At this juncture, we wish also to acknowledge the appearance of Mr. Roger White as Amicus

fact by the administrative officer are accorded deference unless the reviewing court believes the findings to be clearly wrong.

Syl. pt. 1, *Muscatell v. Cline,* 196 W.Va. 588, 474 S.E.2d 518 (1996) (footnote added). Furthermore, "[i]nterpreting a statute or an administrative rule or regulation presents a purely legal question subject to *de novo* review." Syl. pt. 1, *Appalachian Power Co. v. State Tax Dep't of West Virginia,* 195 W.Va. 573, 466 S.E.2d 424 (1995). *See also* Syl. pt. 1, *Chrystal R.M. v. Charlie A.L.,* 194 W.Va. 138, 459 S.E.2d 415 (1995) ("Where the issue on an appeal from the circuit court is clearly a question of law or involving an interpretation of a statute, we apply a *de novo* standard of review."). Having established the parameters of our review in this case, we proceed to consider the parties' arguments.[8]

## III.

### DISCUSSION

On appeal to this Court, we are requested to resolve a solitary issue: whether Maupin, as the owner of "Holy Miloni" and "RC's In Sync," is entitled to receive monies therefor from the West Virginia Greyhound Breeding Development Fund. In deciding this issue, the circuit court found that Maupin was, by definition, the owner of the two dogs and that he also is a West Virginia resident. Therefore, the circuit court found that Maupin had satisfied the requisite requirements and was, accordingly, eligible to participate in the Fund.

In short, the Racing Commission contends that Maupin is not eligible to receive such monies. To support its position, the Racing Commission suggests that the governing law dictates that the greyhounds participating in the Fund be wholly or solely owned [9] by a

Curiae in this case, and we thank him for his participation in this case.

9. The governing regulation also permits qualified lessees of greyhounds to participate in the Fund. *See* W. Va.C.S.R. § 178–2–51.3 (2000). As the parties do not dispute that Maupin is an owner, rather than a lessee, of the dogs in question, however, our discussion of the applicable law will focus on the elements requisite to establishing "owner," rather than "lessee," status.

West Virginia resident or residents. *Citing* W. Va.C.S.R. § 178–2–51.3. Because the registration documents for "Holy Miloni" and "RC's In Sync" list their registered owners as "Daryl Brumage or Harvey O. Maupin, Jr.,"[10] the Racing Commission claims that the dogs essentially are co-owned by one West Virginia resident, Maupin,[11] and one non-West Virginia, Brumage.[12] Thus, the Racing Commission continues, the dogs are not wholly or solely owned by a West Virginia resident or resident(s). By contrast, Maupin contends that the circuit court correctly determined that he is, as the registered owner of both dogs in question and by virtue of his West Virginia residency, entitled to participate in the Fund.

The West Virginia Greyhound Breeding Development Fund was established to promote the ownership and breeding of racing greyhounds by West Virginia residents in the State of West Virginia. W. Va.Code § 19–23–10(d) (1995) (Repl.Vol.2001) sets forth the purpose of the Fund as follows:·

> The purpose of the fund is to promote better breeding and racing of greyhounds in the state through awards and purses to resident owners of accredited West Virginia whelped greyhounds. In order to be eligible to receive an award or purse through the fund, the owner of the accredited West Virginia whelped greyhound

must be a resident of this state.[13] The moneys shall be expended by the racing commission for purses for stake races, supplemental purse awards, administration, promotion and educational programs involving West Virginia whelped dogs, owned by residents of this state under rules and regulations promulgated by the racing commission.

(Footnote added). In order to achieve this purpose, the Fund provides monetary incentives to those individuals owning or leasing West Virginia greyhounds. *See generally* W. Va.Code § 19–23–10(d) (detailing method of calculating Fund disbursements). The specific eligibility requirements for participating in the Fund are set forth in W. Va.C.S.R. § 178–2–51 (2000), which provides, in pertinent part, that

> 51.2. To qualify for purse money in a stake's race as well as purse supplements and awards that are funded from the West Virginia Greyhound Breeding Development Fund, the owner or lessee of the greyhound shall be a member in good standing of the West Virginia Greyhound Owners and Breeders Association.

> 51.3. An Owner or lessees of the dam at the time of breeding[14] shall be a member in good standing of both the National Greyhound Association and the West Vir-

---

**10.** We recognize that the record before the Court reflects that the registration documents for "Holy Miloni" have since been changed to reflect only Maupin's name as her registered owner. *See supra* note 5. Where pertinent, our discussion will reflect this distinction.

**11.** *See supra* note 1.

**12.** *See supra* note 3.

**13.** Recent amendments to W. Va.Code § 19–23–10(d), which were passed on March 13, 2004, and will become effective ninety days from passage, require that, to be eligible to receive monies from the Fund, greyhound owners be "a bona fide resident" of this State. *See* H.B. 4523, 79th Leg., Reg. Sess. (W.Va.2004) (enacted) (to be codified at W. Va.Code § 19–23–10(d)) ("To qualify as a bona fide resident of West Virginia, a registered greyhound owner may not claim residency in any other state. A registered greyhound owner must prove bona fide residency by providing to the commission personal income tax returns filed in the state of West Virginia for the

most recent tax year and the three previous tax years, has real or personal property in this state on which the owner has paid real or personal property taxes during the most recent tax year and the previous three tax years and an affidavit stating that the owner claims no other state of residency."). Given the chronology of the events at issue in the case *sub judice*, however, these new amendments do not apply to our consideration or decision of the instant appeal.

**14.** The date the registration of "Holy Miloni" was changed to include Maupin's name is January 1, 2001; "Holy Miloni" subsequently was bred on January 15, 2001. Likewise, the addition of Maupin's name to "RC's In Sync's" registration occurred on January 17, 2001; thereafter, she was bred on January 24, 2001. *See* W. Va.C.S.R. § 178–2–25.5 (2000) ("No title, leasehold or other interest in any greyhound shall be recognized by the Racing Commission until that title, leasehold or other interest is evidenced by written instrument and duly filed with and recorded by the National Greyhound Association of Abilene, Kansas.").

ginia Greyhound Owners and Breeders Association and have been a bona fide resident of West Virginia for at least two (2) years prior to the date the dam was bred. The litter shall be whelped in the State of West Virginia and remain domiciled in West Virginia at least until the puppies are six (6) months of age.

51.4. The owner or lessee shall file the appropriate affidavit ... with the Racing Commission affirming that the owner or lessee of the dam at the time of breeding meets all of the requirements in subsection 52.3 of this rule. The owner or lessee further understands that if any West Virginia bred is removed from West Virginia prior to six (6) months of age, it is the owner's or lessee's responsibility to notify the Racing Commission within ten (10) days of removal. Any greyhound that is removed to a location outside of West Virginia prior to the completion of six consecutive months of occupancy in West Virginia starting from the date of whelping shall be disqualified by the Racing Commission in participation in the West Virginia Greyhound Breeding Development Fund.

51.5. The owner or lessee of any greyhound that was littered before July 1, 1989, shall be given West Virginia bred status if the Racing Commission affirms that the applicant meets all the requirements in Subsection 51.3 of this rule with the exception that the greyhound was littered and remained domiciled in the State of West Virginia until it was three (3) months of age.

W. Va.C.S.R. §§ 178–2–51.2 through –5 (footnote added). At issue in this proceeding is the language of § 178–2–51.3, specifically that portion which requires the greyhound owner or lessee to "have been a bona fide resident of West Virginia for at least two (2) years prior to the date the dam was bred."

When interpreting a statute or regulation, this Court looks to the precise language employed by the promulgating body. "Where the language of a statute is clear and without ambiguity the plain meaning is to be accepted without resorting to the rules of interpretation." Syl. pt. 2, *State v. Elder*, 152 W.Va. 571, 165 S.E.2d 108 (1968). How-ever, "[i]n the absence of any definition of the intended meaning of words or terms used in a legislative enactment, they will, in the interpretation of the act, be given their common, ordinary and accepted meaning in the connection in which they are used." Syl. pt. 1, *Miners in General Group v. Hix*, 123 W.Va. 637, 17 S.E.2d 810 (1941), *overruled on other grounds by Lee–Norse Co. v. Rutledge*, 170 W.Va. 162, 291 S.E.2d 477 (1982).

Here, we find the language of W. Va.C.S.R. § 178–2–51.3 to be plain and capable of only one construction. The only term relevant to our resolution of this case that is not defined by the companion regulations or authorizing statute is the first word of § 178–2–51.3: "[a]n". According to the linguistic definition of "an," "an" is simply the form of the indefinite article "a" that is used before words beginning with a vowel. *See* Webster's Ninth New Collegiate Dictionary 43 (1983) (defining "a" as an "indefinite article" and indicating that "[i]n speech and writing a is used before a consonant sound .... [and][b]efore a vowel sound *an* is usual"). *See also id.*, at 81 (denoting "an" as an "indefinite article" and referring to definition of "a" for further constructions of "an"). We previously have observed that "[t]he indefinite article 'a' may some times mean one, where only one is intended, or it may mean one of a number, depending upon the context." *Deutsch v. Mortgage Secs. Co.*, 96 W.Va. 676, 681, 123 S.E. 793, 795 (1924) (citation omitted). *Accord Tracy v. Cottrell*, 206 W.Va. 363, 379, 524 S.E.2d 879, 895 (1999) (interpreting "a" as meaning "one" of "many").

Typically, though, "an" is construed as making general, rather than specific, references to its words of modification. *See, e.g., Brooks v. Zabka*, 168 Colo. 265, 269, 450 P.2d 653, 655 (1969) (en banc) (recognizing "the indefinite or generalizing force of ... 'an'" (citation omitted)); *Stephan v. Pennsylvania Gen. Ins. Co.*, 224 Conn. 758, 764, 621 A.2d 258, 261 (1993) (observing that "the indefinite article[ ] ... 'an' refer[s] to unlimited objects" (citation omitted)); *State ex rel. Hurd v. Blomstrom*, 72 S.D. 526, 530, 37 N.W.2d 247, 249 (1949) ("'An' is the indefinite article meaning 'any'."). *But see People*

*ex rel. Barrett v. Ogden,* 8 A.D. 464, 40 N.Y.S. 827, 828 (1896) ("The original meaning of the word ['an'] was 'one'[.]").

■ Given the plurality of the word "lessees" employed in W. Va.C.S.R. § 178-2-51.3, and our efforts to construe the various parts of promulgations consistently with one another, it is clear that the intended construction of the word "[o]wner" encompasses both its singular and plural forms. "Where a particular construction of a statute would result in an absurdity, some other reasonable construction, which will not produce such absurdity, will be made." Syl. pt. 2, *Newhart v. Pennybacker,* 120 W.Va. 774, 200 S.E. 350 (1938). *See also* Syl. pt. 5, *Fruehauf Corp. v. Huntington Moving & Storage Co.,* 159 W.Va. 14, 217 S.E.2d 907 (1975) ("Statutes which relate to the same persons or things, or to the same class of persons or things, or statutes which have a common purpose will be regarded in *pari materia* to assure recognition and implementation of the legislative intent. Accordingly, a court should not limit its consideration to any single part, provision, section, sentence, phrase or word, but rather review the act or statute in its entirety to ascertain legislative intent properly."). Such a construction is also consistent with the definition of an "[o]wner" set forth in W. Va.C.S.R. § 178-2-2.68 (2000), which states that

"Owner" means the person in whose name the greyhound is registered at the meeting in accordance with this rule and *an owner may be a sole owner, part owner, or lessee.* An interest in the winnings

only of a greyhound does not constitute part ownership.[15]

(Emphasis and footnote added). Thus, employing the commonly accepted meaning of "an," it is clear that § 178-2-51.3 permits *any* West Virginia owner or lessee to participate in the Fund so long as the other eligibility requirements are also satisfied. In other words, while the Racing Commission makes a sound public policy argument to limit participation in the Fund to greyhounds who are wholly or solely owned by West Virginia residents, there simply is no support for such a construction in the regulation, itself, or in its authorizing statutory authority. *See generally* W. Va.Code § 19-23-10(d); W. Va. C.S.R. § 178-2-51.

■ Having ascertained the meaning of § 178-2-51.3, we must now determine whether Maupin has, in fact, satisfied the criteria necessary to participate in the Fund. The parties do not dispute that Maupin is "[a]n owner"[16] of the dogs in question and that he has "been a bona fide resident of West Virginia for at least two (2) years prior to the date the dam was bred." W. Va.C.S.R. § 178-2-51.3. Neither is it disputed that the dogs' litter requirement, W. Va.C.S.R. §§ 178-2-51.3 to -4, or that Maupin has satisfied the remaining associational eligibility requirements contained in §§ 178-2-51.2 to -3. Insofar as the eligibility criteria do not require a dog to be wholly or solely owned by a West Virginia resident in order to be eligible to participate in the Fund, we find that the inclusion of Brumage's name on the dogs' registration documents[17] does not prevent

---

15. The corollary definitional statute to this section was amended to include a definition for " 'Registered Greyhound Owner' " as "an owner of a greyhound that is registered with the National Greyhound Association." H.B. 4523, 79th Leg., Reg. Sess. (W.Va.2004) (enacted) (to be codified at W. Va.Code § 19-23-3(30)). Given the timing of the events at issue herein, however, this amendatory language does not impact our decision of this case.

16. *See supra* note 15 and accompanying text.

17. The styling of the dogs' registration documents in the names of "Daryl Brumage or Harvey O. Maupin, Jr." essentially created a joint ownership interest in the dogs. *See* W. Va.Code § 36-1-20(b) (1999) (Supp.2003) ("When the instrument of conveyance or ownership in any

estate, whether real estate or tangible or intangible personal property, links multiple owners together with the disjunctive 'or,' such ownership shall be held as joint tenants with the right of survivorship, unless expressly stated otherwise."). *See also* 20 Am.Jur.2d *Cotenancy and Joint Ownership* § 3, at 107 (1995) ("An estate in joint tenancy is one held by two or more persons jointly, with equal rights to share in its enjoyment during their lives, and having as its distinguishing feature the right of survivorship, by virtue of which the entire estate, upon the death of a joint tenant, goes to the survivor[.]" (footnotes omitted)); *id.* § 7, at 112 ("A joint tenancy is held 'by the moiety or half and by the whole.' The interpretation of this phrase seems to be that such tenants are seized of the entire estate for the purposes of tenure and survivorship but of only an undivided part or interest for the purpose of

Maupin from receiving the monies from the Fund to which the dogs are entitled. Moreover, to the extent that "Holy Miloni's" registration documents have been changed to reflect Maupin as her sole owner, we likewise find no impediment to Maupin's receipt of Fund monies attributable to her. Accordingly, we affirm the decision rendered by the Circuit Court of Kanawha County achieving this result.

## IV.

## CONCLUSION

For the foregoing reasons, the March 26, 2003, order of the Circuit Court of Kanawha County is hereby affirmed.

Affirmed.

Justice MCGRAW dissents and reserves the right to file a dissenting opinion.

MCGRAW, Justice, dissenting.

As the majority points out correctly in the third paragraph of its discussion: "The West Virginia Greyhound Breeding Development Fund was established to promote the ownership and breeding of racing greyhounds by West Virginia residents in West Virginia." By allowing an out-of-state owner to benefit from the fund, the majority decision is at odds with this avowed purpose. The Legislature intended to encourage greyhound breeding and its associated economic activity to take place in West Virginia. The regulation restricts the benefits of the fund to "bona fide resident[s] of West Virginia." W. Va.C.S.R. § 178–2–51.3 (2000). It does not go on to add "or any out of state greyhound breeder with really clever lawyers."

It is my hope that the 2004 amendments to W. Va.Code § 19–23–10(d) mentioned by the majority will foreclose any such chicanery in the future. Otherwise, West Virginians will be deprived of the opportunities intended by the Legislature when it created the fund. Therefore, I must respectfully dissent.

forfeiture or immediate alienation." (footnotes omitted)).